Mahlon STEWARD

v.

J. D. HENDERSON, Warden, and J. F. Alderete, Chief Medical Officer, United States Penitentiary, Atlanta, Georgia.

Patrick J. O'SHEA, Minister of Information, Jerry Mack Dorrough, Prime Minister; Individually and on behalf of members of the Church of the New Song; and all other inmates of the Atlanta Federal Penitentiary

v.

J. D. HENDERSON, Warden, and J. A. Alderete, Chief Medical Officer; and all other non-inmate staff at the Atlanta Federal Penitentiary Hospital.

James H. MILLER [1] et al.

v.

Richard G. KLEINDIENST, Attorney General of the United States, Department of Justice, and his Aiders/Abettors, e. g.; et al.

Civ. A. Nos. 17043, 17080 and 17266.

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 2, 1973.

M. C. Mykel, Atlanta, Ga. (Court-appointed), for plaintiffs.

John W. Stokes, U. S. Atty., Anthony M. Arnold, Asst. U. S. Atty., Atlanta, Ga., for defendants.

1. Upon their timely requests, petitioners James Henry Miller and Harold D. Phipps have been dismissed from the above-captioned action.

## ORDER

EDENFIELD, District Judge.

The above-captioned cases were consolidated and came on for a hearing on July 11 and September 25, 1973.

In Civil Action No. 17080, petitioners, prisoners at the United States Penitentiary, Atlanta, Georgia, argue that the emergency medical treatment procedures and facilities at the prison are insufficient to ensure constitutionally adequate medical care for inmates suffering from heart disease and who are prone to heart attack. The action was brought following the death of an inmate who suffered a heart attack and died despite efforts of the prison hospital staff to save his life. At the July 11th hearing, an inquiry was made into the procedures and facilities available for treating emergency cases of heart failure. The testimony received did not substantiate petitioners' allegations. Procedures exist for an inmate suffering a heart attack to be transported to the prison hospital where a resuscitation unit can be used to sustain life, until he is taken to Grady Memorial Hospital, some three miles away. At Grady, intensive emergency and long-term care is available. The present prison emergency medical procedures and facilities do not evidence a constitutional deprivation of petitioners' right to adequate medical care.

In Civil Actions Nos. 17043 and 17266, the petitioners complain that they have not been able to adhere to their medically prescribed diets because the food available in the prison mess hall is consistently high in saturated fats, sodium and sugar. It is undisputed that petitioners herein are suffering from heart disease, diabetes, or both, and that they have been ordered by doctors, either at the prison hospital or at Grady Hospital, to follow special diets. The particular diets prescribed vary according to the nature and severity of the specific conditions being treated, but in general they involve restrictions on the amount of saturated fats (e. g., butter, animal fat, whole milk, egg yolks), sodium (e. g., table salt), or sugar, which petitioners can safely eat. For some of the petitioners, the amount of contraindicated food substances which can be safely ingested is extremely small, for others the dietary restrictions are less severe.

At the September 25th hearing the Director of the Cardiac Clinic at Grady Memorial Hospital, Dr. Nanette Wenger, testified on the importance of diet to the health maintenance of cardiac patients. The regulation of the kinds of food which a patient can eat, she testified, is a necessary form of therapy and a physician prescribes a particular diet in the same manner as he prescribes the taking of particular medication. Dr. Wenger stated that there is no way of determining with precision the extent to which a patient's inability to follow a prescribed diet will place his health and life in jeopardy. But from her testimony it was abundantly clear that the ignoring of dietary restrictions will, at the very least, result in aggravation of the patient's condition. There is no dispute that prescription diets are a form of treatment which physicians regard as an integral part of therapeutic and preventive medicine.

Mrs. H. McDaniel, a dietician attached to the Cardiac Clinic at Grady, was asked by petitioners' counsel to examine the prison menu for the week of March 11, 1973, and to render her expert opinion as to whether an inmate placed on a "low fat" diet could select enough food items to receive adequate nourishment, and still adhere to the restrictions of his diet. The menu in question was stipulated as being fairly representative of menus offered throughout the year. Mrs. McDaniel testified that if the foods listed were prepared in "customary fashion" an inmate following such a diet would not be able to eat properly and still refrain from eating proscribed foods. Cross-examination revealed that the "customary" preparation Mrs. McDaniel referred to involved the use of saturated or "hard" fats, including but-

ter, in the cooking of meats, vegetables and soups. It was also testified that an inmate on a "low sodium" diet would be severely restricted in the number of food items which he could eat by the "customary" addition of salt in the general preparation of food. Significantly, Mrs. McDaniel testified that if the foods were not prepared with the "customary" use of hard fats and salt, the menu in question would be perfectly acceptable for patients on low fat or low sodium diets.

From this testimony it became evident at the hearing that whether a prisoner on a special diet could eat properly from the prison mess line depended on how the food was prepared. The petitioners testified from their personal knowledge that the vegetables served were prepared with butter, that hard fats were used in the preparation of meats and soups, and that salt was added as a matter of course to every appropriate item. The prison's consulting dietician objected that there had not been an "excessive" amount of butter or salt added to the food in the past, and that, in any case, she had recently instructed the prison food service administrator to cease using hard fat and salt in general food preparation.[2] On cross-examination it was brought out that she inspected the food on a monthly basis by observing it served from the mess line and that she had not watched its preparation in the kitchen. Given this response, the court asked the prison's Chief Medical Officer, Dr. J. F. Alderete, whether he had any objection to the court's entering an order directing the preparation of the prison's food without salt and without hard fats. He said he had no objection.

■■ This court is well aware of the plethora of cases holding that judicial intervention into the workings of prison administration should be made only where there exists an abuse of discretion. The court agrees that judicial interference must be the rare exception. The court also notes, however, that prisoners, like other men, are entitled to reasonable medical care. Edwards v. Duncan, 355 F.2d 993 (4th Cir. 1966), and that in this action petitioners have presented a claim which goes far beyond the usual conclusory allegations which deserve summary dismissal.

■ The situation complained of here, if left uncorrected, would be destructive to just administration and prison discipline, and violative of petitioners' constitutional right to receive adequate medical care. It borders on the cruel and unusual to instruct a man that he must not eat certain foods on peril of damaging his health and then provide him with a menu where the only foods offered are the very ones proscribed. The prison administration has recognized the dangers of this situation by its instruction to the kitchen staff that food should now be prepared without salt and without butter. To assist the prison's voluntary recognition of the problems presented, and to ensure a continuing solution, the court will order that petitioners, and others similarly situated within the prison, be afforded the opportunity to eat foods prepared without saturated, "hard" fats or salt. No order will be entered concerning sugar, as there was insufficient evidence to warrant a finding that diabetic inmates could not safely and properly eat from the prison menu by careful selection from the foods served.

How the prison administration chooses to carry out this order is its business. A number of possibilities present them-

---

2. The court recognizes that for some inmates under mild dietary restrictions a moderate level of salt and saturated fat in the food might be acceptable. For others, however, including petitioners Miller and Harrison, it is equally clear that any amount of addition-al fat or salt would be seriously detrimental to their health. This being the case, even moderate amounts of fat and salt would make the prison menu largely unedible for some, for whom no alternative source of food was available.

selves. Prisoners with special dietary needs, as medically determined, might take their meals from a "diet line" of specially prepared foods. Or, all meals served in the prison could be made with polyunsaturated fats and without salt. Salt could be added according to individual tastes, and the use of "liquid" polyunsaturated fats would, according to Dr. Wenger, be of benefit to the health of everyone concerned, whether suffering from a cardiac ailment or not. Or, all meals, as apparently is now the case, could be made without salt and without any fats. This, the court thinks, would not be the preferable alternative as, according to the expert testimony received, the individual's need for some fats in his diet, unsaturated fats in the case of an inmate on a low fat diet, would have to be satisfied in some other fashion.

To prevent misunderstanding, the court is not directing the prison officials to provide a full panoply of dietary foods, desserts, soft drinks, and the like. It is requiring only that petitioners and others similarly situated be afforded food of the type now regularly appearing on the prison menu prepared without salt and without saturated fats. Obviously, some foods on the menu (ice cream and saltine crackers, to cite simple examples) will not be edible by certain inmates. The court's order today does not require that dietary substitutes for these foods be found, so long as a reasonably nutritious meal can be otherwise obtained. Finally, whether an inmate has a legitimate, medically prescribed diet is a question wholly within the province of the prison administration.

In accordance with the foregoing discussion, respondents Henderson and Alderete are ordered to afford petitioners herein, and those in the prison similarly situated, with regular and reasonably nourishing meals prepared without salt and without saturated fats. Civil Action No. 17080 is hereby dismissed.

So ordered, this 29th day of September, 1973.